PIERCE, Judge.
This case is an appeal from an order entered by the Juvenile and Domestic Relations Court of Hillsborough County, giving the maternal grandmother of five minor children, aged from 6 to 14 years, the right to take said children from Hillsborough County to her home in England, over objections of the natural father of the children, Robert Raymond Holman.
The background of this unfortunate case dates from July, 1966, when the father and his then wife, mother of the children, separated from each other, caused probably by the father’s excessive drinking. Thereafter, on September 24, 1966, she was killed in an automobile accident in South Carolina. The father was a retired Lieutenant Colonel in the U.S. Air Force, drawing retirement service pay of about $480.00 per month, and at the time of his wife’s death was employed at a Tampa drug store. The parents had originally met in England where she lived and where he was stationed in the service. They married there, and later came to this country and settled in Tampa, he being honorably discharged from the Air Force in 1960.
After the mother’s accidental death the father moved into a home and had a housekeeper, who lived in, caring for the children. Two days after the mother’s death, her mother, grandmother of the children, aged 62 years and a resident of Blackpool, England, came to Tampa and soon thereafter went to the Juvenile and Domestic Relations Court in Tampa, where she filed a petition under F.S. Ch. 39, F.S.A.,[1] ask *655 ing that the children be declared by the Court to he dependent children and that she, the maternal grandmother, be granted custody of the children. The petition was filed on October 14, 1966 and from that date until December 22, 1966 the case was continually before the Juvenile Court. The major part of four separate days in December was consumed in taking testimony, all of which was transcribed and filed. The record is also replete with many and numerous reports, letters, hospital records, exhibits, etc.
On December 22, 1966, the Court entered order finding, among other things, that the father was “a chronic alcoholic” and that he “should not have the care of the children”, whom the Court found “to be dependent”. It was ordered that “the children be placed in the care of * * *. their maternal grandmother, on the condition that * * * [she] not move them from the jurisdiction of this Court until further order”. Counsel for the father and the grandmother were directed to try “to arrive at a satisfactory agreement for a surety bond which will enable * * * [the grandmother] to take the children to her home in England and yet ensure her compliance with any order which this Court might in the future enter relative to their return to the father should he rehabilitate himself to the point that he can provide a suitable home for them”.
The parties were unable to arrive at such “satisfactory agreement”, whereupon the Court on February 10, 1967, entered order which “authorized” the grandmother to take the five children “with her to her home in England”, upon the posting by her “of a good and sufficient property bond” in the sum of $1,500.00 “conditioned upon her faithful compliance with future orders of this Court affecting the placement of the children”. From said order, the father has appealed to this Court and has perfected a supersedeas, the effect of which is that the children are presently “placed with the Children’s Home, Inc., for care until further order”.
This unhappy case has presented many “complexities”. It has unquestionably given the conscientious Juvenile Judge many “perplexities”. This Court itself has not been immune.
Children have always inherently been the wards of the Court, particularly the Juvenile Courts of the State. And when jurisdiction shifts to the appellate Court by the process of appeal, children become, in effect, wards of that Court.
We are troubled about the trial Court’s two orders aforesaid and the practical impact of those orders. The maternal grandmother was “authorized to take” all five children, three girls and two boys, aged from 6 to 14 years, “to her home in England”. Once there, the children would be effectually insulated from the supervision and orders of the local Juvenile Court. And likewise, the grandmother herself, except for the dubious “condition” of the “property bond”, would be beyond the reach of the Courts of this State.
It is urged here that there is no law for the posting of such a bond and that there would be no practical method of enforcement, all of which may well be true. But we pass over the minor matter of the bond with no more than mere comment. What we are deeply concerned with is the divestiture, for all practical purposes, of the future supervision of the children, and the abdication of the responsibilities of the Florida Courts in directly safeguarding their future best interest and welfare.
And we are secondarily concerned with the rights of the father to have accorded to him, as the sole remaining natural parent, some degree of recognition, practical as well as theoretical, of his inherent right of *656 future custodial supervision of his own children, if and when he should become rehabilitated.
Once the children get to England in their grandmother’s home, they will be exclusively subject to and governed by the custodial and adoption laws of that country, whatever they are; and also to the predilections and notions of English Judges, whatever they may be. We cannot agree that F. S. Ch. 39, F.S.A. contemplates, over objection of the resident natural parent or parents, such withdrawal of the responsibility of the Juvenile Courts of Florida to protect the future welfare of minor dependent children who are presently within their exclusive supervisory jurisdiction.
Consistent with the foregoing views, proper disposition of this appeal is unusually difficult. Up to the time of the Court hearings the father had not distinguished himself, particularly since the death of his wife, in discharging his responsibilities to the children. He was drinking constantly to excess and the Court was warranted in finding that he was a “chronic alcoholic”. But he voluntarily hospitalized himself in October, 1966, and since his release on October 29th the medical testimony was that he “was greatly improved now * * * his attitude was good * * * and [he] is now in good health”. Psychiatric testimony bolstered this appraisal. He had been appointed administrator of his wife’s estate, was still acting as such, and there was no intimation of unfitness. In the order of December 22nd, 1966, the Court found that after his discharge from the hospital “it does appear that Mr. Holman has made an earnest effort to regain control of himself. His physical condition has greatly improved”.
There was some evidence that the father had made fondling advances toward one or two of the children but it was apparently so vague and unconvincing that the trial Judge made no finding on it. There was also testimony by one or more of the children that they preferred to go to England with their grandmother but the Court deigned comment on this. The Court orders were grounded solely upon the father’s past addiction to alcohol.
The father had been working as manager of a local service station since his October hospitalization and his employer testified that during such time the father “was sober and a good and dependable worker”. Also the proprietor of the boarding house where the father lived during that time testified that he “had not had any alcoholic beverages, was employed and worked every day”.
Our conclusion is that the children should not be sent to England on the basis of the present record. We are not convinced it would be to the best interest of the children, even if such arrangement were permissible under F.S. Ch. 39, F.S.A. Nor are we convinced, on the basis of the same record, that the Court was in reversible error in not returning the children to the father, at least at that time.
The Court found that the father “has made an earnest effort to regain control of himself [and that] his physical condition has greatly improved”. During the course of the trial, the Court observed that — “if Mr. Holman is to rehabilitate himself it is going to be only over a period of time. I would say that it would be a minimum of a year before anyone- — -and certainly I would feel confident that he is in a position to care for his children”.
Almost a year has now elapsed and we are of course unadvised, as is undoubtedly the Juvenile Court, as to what progress, if any, the father has made toward rehabilitation during that time. We conclude the proper thing to do is to send the matter back to the lower Court so that the Juvenile Judge may reopen the case and receive such testimony and evidence as might be offered as to the pertinent acts and conduct of the parties to this proceeding since December 22, 1966, and to thereafter enter an amended order touching the further care and custody of the children, based upon the entire *657 record then before the Court, including the evidence already taken. At the oral argument before this Court the Assistant Attorney General, with commendable candor, was agreeable to this suggestion.
The order appealed from is therefore vacated and the cause remanded to the lower Court with directions to take testimony as aforesaid and enter new order accordingly.
So ordered.
LILES, C. J., and HOBSON, J., concur.

. F.S. Sec. 39.05, F.S.A. provides: (1) The counselor, any assistant counselor, or any other person may file in the juvenile court a petition stating that a child within the county or district wherein the juvenile court is established is a dependent or delinquent child.
(2) The petition must be in writing, signed and verified by the affidavit of the person signing it, made before the judge, counselor, or an assistant counselor of the court in which the petition is filed. The affidavit may be upon information and belief.
(3) The petition, all orders and other papers filed in the official records in any case shall be entitled “In the interest of _, a child.”
(4) The petition shall set forth the name, age, and residence of the child; the names and residence of the parents or legal custodians of the child; and the facts which are alleged to constitute the child a dependent or delinquent child. If any such information shall be unknown to the person signing the petition, the petition shall so state. The petition shall be sufficient if it clearly, fairly and concisely states the substance of the facts which, if true, constitute the child a dependent or delinquent child, in such manner as to apprise the parents or legal custodians of the child, and to apprise the child if the child is of sufficient age and understanding, of the nature thereof, couched in narrative terms and not in the usual language of criminal informa-tions and indictments.”
F.S. Sec. 39.01(10) F.S.A. provides:
“ ‘Dependent child’ means a child who, for any reason, is destitute, homeless, dependent upon the public for support, or has not proper parental support, maintenance, care, or guardianship; or who is neglected as to proper or necessary support or education as required by law, or as to medical, psychiatric, psychological or other care necessary for the well-being of the child; or who is abandoned by the child’s parent or other custodian; or whose condition or environment are such as to injure or endanger the welfare of the child or the welfare of others; or whose home, by reason of neglect, cruelty *655 or depravity, or other adverse condition, on the part of the parents, legal custodians, guardian or other person in whose care the child may he, is an unfit place for the child.”