**In the Interest of ALETA MACKEY, a child.**
No. 31-907-B.
Juvenile and Domestic Relations Court, Palm Beach County.
February 5, 1971.

100

W. Scott Eubanks, Jr., Boca Raton, for the petitioners.

Louis G. Carres, Delray Beach, for the respondent.

LEWIS KAPNER, Judge.

This cause was presented upon a petition for dependency and protective custody filed by the petitioners herein, the paternal grandparents and the father of the above child. The petitioners are represented by W. Scott Eubanks, Jr., and the respondent-mother is represented by Louis Carres of Florida Rural Legal Services, Inc. All parties were present and testified at the hearing.

The subject matter of this controversy is a three-year-old girl, Aleta Mackey, born February 22, 1967, the daughter of Douglas and Barbara Mackey.

Mr. & Mrs. Mackey were married on August 6, 1965. They separated in August 1967, and have remained separated except for a brief period in 1970 when they attempted a reconciliation.

In the summer of 1970 Barbara Mackey and her daughter Aleta took up residence on a farm in Wawina, Minnesota, with eight other adults (four men and four women), six of whom were legally married, and five children. The parties lived on this farm in a communal or cooperative sort of arrangement.

In early October 1970 Douglas Mackey visited Mrs. Mackey and her daughter at this farm. At that point Mr. Mackey determined that conditions were detrimental to his daughter's wellbeing and he decided to remove Aleta and assume custody of her. He did not do this right away but waited for a propitious opportunity which came in late November. At that time he took his daughter, with the consent of Mrs. Mackey, on the pretense of a five day visitation. Instead, he brought the child to Florida for the purpose of acquiring custody of the child.

On November 20, 1970, Mr. & Mrs. Kenneth Mackey, the paternal grandparents of the child, filed a petition in this court alleging that Barbara Mackey had periodically and wilfully abandoned the child to the care and custody of the petitioners; lived a life of thievery; had been committed to a psychiatric institution; was a user and seller of drugs; and was providing filthy and grossly inadequate living quarters for her. Based upon these facts the petitioners alleged the child to be dependent and requested temporary custody pending further proceedings in this court and anticipated divorce proceedings in the circuit court. (Douglas Mackey has not yet initiated proceedings in the circuit court because he has not been a Florida resident for six months.) The petitioners further alleged that the respondent and her friends were violent and had "threatened" the petitioners and Douglas Mackey, and asked that the respondent be restrained from exercising any visitation pending further order of the court.

At a later time the father of the child, Douglas Mackey, joined in as a petitioner.

Based upon that presentation the court granted the petitioners' request.

The first issue is whether the child is dependent under Florida law.

Florida Statutes 39.01(10) defines a dependent child as one who "for any reason, is destitute, homeless, dependent upon the public for support, or has no proper parental support, maintenance, care, or guardianship . . ."

The testimony of the father is that he is not in a position to take care of the child at this time in that he does not have a home of his own and he is living with his parents — and that the mother is unfit to take care of her. The mother testified that she is a fit mother but she is prevented from assuming custody of the child by the obstinance of her husband and his parents.

Upon these facts it appears clear that the child is not receiving the proper parental support and is therefore dependent.

The respondent has initiated divorce proceedings in Minnesota* and she contends that that court rather than this court should determine the question of custody, both temporary and permanent, of Aleta. In deciding that question it would be well to review the circumstances surrounding the removal of the child from her mother's custody.

Barbara Mackey, the mother of the child, had physical custody of Aleta for several months following her last separation from her husband and up until the time her husband secreted the child away. This custody, in the court's opinion, amounted to legal custody against all others, including the child's father. It is not true, as the father has claimed, that the father has as much a right to assume physical custody as the mother in such circumstances. Nothing could be more destructive of societal order, or more deleterious to the emotional well-being of children, than to permit one estranged parent to snatch his child from the custody of the other parent.

An estranged parent of a child is not without remedy when he believes that he should have custody of his child. He may apply before a court with or without ancillary divorce proceedings. The powers of a court over children are plenary and immediate. If a situation is extreme the authorities can take immediate custody of a child and (in Florida) the court must hold a hearing within forty-eight hours. If the court determines that a child is dependent it has enormous powers to deal with that problem immediately and completely.

The courts are given such broad powers in recognition of the fact that emergency situations may arise with respect to children that will not permit the normal cumbersome process of most litigation. It should be obvious that reliance upon the courts and upon

---

*Mr. Eubanks, attorney for the petitioners, notified the court this morning that the clerk's office in Minnesota had no record of these proceedings. Shortly thereafter the respondent's Minnesota attorney called this court and stated that the respondent had initiated proceedings but there would be no record of this until the defendant is served.

orderly procedure is the only guarantee that such intensely emotional matters may be disposed of objectively in the best interest of the child and in a manner appropriate to a stable society. It is only in the most immediate, dire emergency that a parent should unilaterally remove a child from the other parent who has actual custody of that child.

This certainly was not the case here.

The father decided to remove the child in early October, 1970, and, according to the testimony, the most serious aspects of the child's environment were not even made known to him until after that decision was made. At any rate he waited six to eight weeks to take any action which was more than enough time for him to seek court action or to notify the juvenile authorities in Minnesota.

It is certainly logical and reasonable that the petitioner should be expected to take this course rather than the one he took since the whole crux of his action must rise or fall on the fitness of the respondent and the fitness of the surroundings, both of which require testimony of persons who are available in Minnesota but unavailable to this court.

There would appear to be no reason why the father did not initiate court action in Minnesota save for the fact that he did not believe that that court would share his viewpoints on the deleteriousness of the surroundings of the child and that the only way that he could get court sanction of his custody would be to obtain physical custody and then to make it practically impossible for the respondent to prove that she is a fit mother.

The evidence adduced at the hearing, coupled with the court's investigation (made at the behest of the petitioner), confirms that the Minnesota court would hold a clear advantage in determining this question.

The petitioner has presented evidence that the home was dirty and filthy and the children were required to sleep on mattresses on the floor; that the child was exposed to illicit drugs, specifically marijuana; and that the child once observed her mother and another man having sexual relations.

Not only was the evidence presented by the petitioner weak in and of itself — consisting mainly of the petitioner's own testimony and hearsay testimony of the three-year-old girl — but the results of the court's investigation strongly negated it.

The respondent has presented twelve separate affidavits on her behalf from apparently reputable members of her community. These affidavits may be described as follows —

Miss Mary Jo Engler, a social worker who has known the respondent professionally since May 1970, supports the respondent's "retention of the legal and physical custody of her child."

Father Paul Berg and the Reverend Father William J. Teska, who are familiar with the Wawina community, believe that it provides a wholesome environment for the child.

Mrs. Happy Miwa, personal secretary for the last sixteen years to the federal district judge in Minnesota, who swears that "from a personal, first-hand observation of the close mother-child relationship that the child, Aleta, *surely* will suffer much mental anguish and *possibly* personality damage if kept apart from her mother," and that "under no circumstances would [she] consider Barbara Mackey to be an unfit mother in *any* sense of the word."

Ed Emerson, an instructor in mathematics at St. Thomas College, who spoke highly of the residence and the environment at the Wawina farm and of the close mother-child relationship.

Lawrence Kapplinger, a property owner, commented on how well behaved the Wawina children were.

Mr. and Mrs. Robert Crabb, an editor of the Minneapolis Morning Tribune and a legal secretary employed as assistant office manager, whom the respondent is now staying with, spoke highly of the respondent's maternal relationship with her child.

Lucille Olsen, a friend of the respondent's for two years, spoke in detail of the respondent's high character and high maternal fitness.

Ken Popkin, a college instructor and social worker, speaks highly of the respondent's character.

Mrs. Margaret Trombley, mother of the respondent, speaks in detail about her daughter's maternal fitness and also about the relationship between her daughter and Douglas Mackey.

Marie Hogenson, the respondent's social worker, whose affidavit is in the form of a six page letter and is of particular interest. Mrs. Hogenson believes that the house was adequate in size and structure for each member to live in comfortably and that the school officials were extremely

complimentary of the Wawina children and that she herself shared this opinion from personal observation. She also spoke to several neighbors and police authorities who spoke very highly of the residents of the farm.

In addition to the fact that the court's investigation has turned up much evidence favorable to the respondent and little evidence unfavorable to her, the testimony showed that her living arrangements there were temporary and caused in part by the father's failure to provide any child support; that she has now regained her health and has more than one job prospect; that she is currently living with Mr. and Mrs. Robert Crabb who appear to be responsible adults; that she also has the option of living with her own parents or on her own. This adds up to the conclusion that even if the then existing situation was harmful it was capable of correction and that, in fact, it has been corrected and, further, that the respondent's present ability to care for the child has not been successfully challenged.

If we are to give any weight to these affidavits and the evidence presented to the court, we must conclude that the respondent is a warm, stable and constructive mother for her child; that the farm in Wawina was not a "commune" in the sense of nine adults living in a continual orgy but rather a simple farm where nine adults, six of whom were lawfully married, shared the responsibilities in a cooperative manner; that these residents were not degenerates but highly moral people, accepted by their community and the police authorities; that the surroundings were healthy, both physically and spiritually; and that drugs were at best an infrequent occurrence — offset, in the court's opinion, by the father's own use of marijuana.

Petitioner objects to the introduction of these items on the grounds of hearsay and this objection is well-founded. Yet, even without them, it should be presumed that the respondent is a fit mother in the absence of competent evidence to the contrary and the petitioners have manifestly failed to carry their burden. The testimony that the place was dirty is not very convincing and is fully rebutted by the testimony of the respondent. The testimony that the child was "exposed" to the use of marijuana by the respondent consists mainly of hearsay evidence and is more than offset by the father's use of marijuana as well as the fact that he learned of Aleta's knowledge as a result of her being "exposed" to his brother's "roach-clip." Testimony of the child's observation of her mother having sexual relations can hardly amount to convincing evidence of a pattern of vulgar sexual habits manifestly committed in the presence of the child.

The petitioners also introduced much evidence as to the respondent's immaturity, and incapacity to serve as a mother, but this this evidence was either inconsequential (a vagrancy arrest in Miami for hitchhiking) or remote in time (psychiatric treatment in 1968). These "character deficiencies" seem to be either offset by the respondent's ability to learn from her mistakes or by equally deficient aspects of the father's character such as failing to support his child, beating up his wife, using marijuana, waiting six to eight weeks to secret his child from his mother rather than taking the more responsible route through the courts, and living an erratic and immature life himself.

In short, he has failed to carry the burden of presenting a preponderance of competent evidence that the respondent was and is an unfit mother. He has failed to justify his actions in unilaterally removing his child from her mother's custody without a court order. He has failed to present facts which would justify this court determining the respondent's unfitness when all the witnesses are located in Minnesota.

He has also failed to present a valid reason why the child should not reside and remain with her mother, who had physical custody prior to the father's action, or the respondent's parents, rather than the father or the paternal grandparents. The petitioner cites the case of Holman v. State, 203 So.2d 653, and argues that this court cannot permit the child's removal to another state. Holman v. State does not hold that. That case was concerned with taking children from the natural parents and giving them to their grandparents in a foreign country. This case is concerned with placing custody in one parent rather than another, in a different *state* rather than a different *country.* Further, if the court permits the removal of this child to Minnesota it will be contemplating relinquishing jurisdiction to another court rather than continuing supervision of this case.

Upon consideration of these facts, it is thereupon ordered that — (1) This court has jurisdiction over the child herein. (2) That the respondent is a fit and proper person to have custody of this child pending further order of this court or any other appropriate court. (3) That the petitioners shall release the custody of the child to the respondent without delay. (4) That the respondent may remove the child to Minnesota subject to further orders of this court or any other appropriate court in Minnesota. (5) That this court shall retain jurisdiction for the purpose of entering such further orders as to the court may seem necessary or until such time as this court relinquishes jurisdiction to another court appropriately assuming jurisdiction over this case.